**People of the State of Illinois, Plaintiff-Appellee, v. Willie Lee Hill, Defendant-Appellant.**

**Gen. No. 50,175.**

First District, Second Division.

October 19, 1965.

Fred Bezark, of Chicago, for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Robert Beranek, Assistant State's Attorneys, of counsel), for appellee.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Two indictments were returned, one charging Willie Lee Hill with assault with attempt to commit rape and another with assault with attempt to commit murder. On the motion of defendant, the indictments were consolidated for trial. He pleaded not guilty. A trial without a jury resulted in a finding of guilty on each charge and a judgment and sentence in each case that he serve a minimum of 5 and a maximum of 12 years in the penitentiary, the sentences to run concurrently. He appeals. Florine Lamar testified that on the morning of September 8, 1961, she resided at 6146 South Kenwood, apartment 512, Chicago, Illinois. She was lying across her bed wearing only a blouse and panties. At approximately 3:00 a. m., she awoke, turned on the radio and opened

the main door to her apartment, keeping the shutter door locked and closed, and returned to bed. She looked up and saw the defendant on his hands and knees in her room. She screamed and cried out. He knocked her off the bed and told her to keep quiet. He dragged her to the couch, one hand in her back and the other in her hair and he tore her panties. She continued to resist and defendant kept knocking her head down and hitting her eyes and tried to put his penis into her vagina. He placed a knife around her neck. Accidently she slipped, he pulled her up and went toward the door. Just before he reached the door Carol Pittman, a tenant from across the hall, called out (on hearing the screams, crying and the sounds of falling furniture) Miss Lamar's name. The defendant closed the door with one hand and began to strike the victim, Miss Lamar. He knocked her toward a window. He then let her drop and she was able to reach her purse where she had a loaded revolver. She pointed the revolver at him. The defendant reached for a chair. She fired and he struck her with the chair three times until she dropped the revolver. He then picked up the revolver, put it in his pocket and left the apartment. Miss Lamar was bleeding, her eyes were swollen and there were scratches on her face, neck and legs. She was hospitalized for two and one-half days. She identified the assailant as Willie Lee Hill, the defendant.

Miss Carol Pittman, a neighbor who resided in the apartment across the hall from the apartment of Miss Lamar, in the same building, testified that some time after midnight of September 8, 1961, she heard a scream coming from Miss Lamar's apartment. Miss Lamar hollered "help me, help me, somebody's trying to rape me." Miss Pittman tried to open the shuttered door but the defendant slammed the main door. She testified that she knew the defendant, and recognized his voice, as the voice saying "shut up bitch." "Yes, I'll kill a bitch like you," and one time saw him standing in the apart-

187

ment. She heard Miss Lamar crying and saying "If I do it, will you kill me?" Then Miss Pittman saw defendant come out of Miss Lamar's apartment. Before the defendant came out of the apartment, witness Pittman heard sounds as if the apartment was being wrecked and she (Miss Pittman) had sent her boyfriend Sylvester outside the building to get the police. Sylvester Robinson, Miss Carol Pittman's boyfriend and cotenant and also a friend of the defendant, testified that he had been with Willie Lee Hill earlier in the evening in question and that defendant questioned him concerning Miss Lamar. He also testified that he heard the sounds of a fight coming from Miss Lamar's apartment and heard Miss Lamar shouting, "Help, he is raping me," but that he did not see defendant in or around the apartment of Miss Lamar. Robinson identified the voice emitting from the apartment as that of the defendant. Robinson also testified that he called the police immediately upon hearing what defendant was saying and doing.

Edna Blake, a 6th floor resident of the building testified that around 3:00 or 4:00 o'clock in the morning she heard footsteps in the hallway, looked out and saw defendant standing on the fire escape. She later heard screams of a girl and a shot and saw defendant getting off the elevator and going into his apartment. When she saw defendant, after the screams and shot, he was wearing a robe. Minutes later she saw him leaving his apartment and the building fully clothed. Kenneth E. Brooks, a police officer, testified that he was called to 6146 South Kenwood on the night in question to investigate an attempted rape. When he arrived at apartment 512, he saw Florine Lamar and she was bleeding heavily from the head. He further testified that he looked into her apartment and found it to be in a general state of disarray. He and his partner took Miss Lamar and Miss Pittman to the Woodlawn Hospital. Thereafter he and his partner returned to the building and inquired

into the whereabouts of defendant. Unable to find him the officer and his partner returned to Woodlawn Hospital, where they picked up Miss Lamar and transferred her to Cook County Hospital. Officer Robert Jennings testified to substantially the same facts as Officer Brooks. Detective Bruno Canale corroborated the testimony of the other two officers but added that in the apartment he saw a broken chair and a woman's panties with the crotch torn out. He also found the apartment in a general state of disarray. Doctor Albert Samander testified that he treated Miss Lamar at Cook County Hospital and that he performed a pelvic to disclose the presence or non-presence of sperm in the vagina. The test was negative. The Doctor said that Miss Lamar was severely bruised about the head and body and that he stitched the scalp wound and applied medication to her badly swollen left eye. Leslie Wright, defendant's mother, testified that her son returned home around 11:00 p. m. on September 7, 1961, ate dinner and went out again. The next time she saw him was right after the officers had left and after they had inquired as to the whereabouts of her son. She did not know whether her son was home at the time the crime took place. She testified that she was sleeping. The defendant testified that he was not at home at the time of the occurrence; that he was not in the building and that he returned as Miss Pittman and Miss Lamar were entering the squad car. It was then that he met and spoke to a girl named Joan as he got off the elevator on the 6th floor at 6146 South Kenwood. He testified that he did not know Joan's last name. Defendant testified that after entering his apartment he left soon thereafter to return to the street. He looked up a friend by the name of McGee and remained with him for a few days. He could not give McGee's first name or give an accurate address. On September 11, 1961, defendant, having heard that he was being sought by the police, surrendered to Detective Canale.

189

■■ At the close of the People's case the defendant requested that he be given a lie test. Defendant insisted that the trial judge erred in not permitting him to take a lie test in order to introduce the results as evidence and thus add weight to his testimony that he was not at the scene when the crime allegedly occurred. Defendant says that there is no way of knowing what the test would have shown. The People reply that the trial court acted properly in refusing the defendant's request to take a lie detector test in order to introduce such a test as evidence. Ill Rev Stats 1959, chap 38, par 736.2, in effect at the time the alleged crime was committed, reads:

"In the course of any criminal trial the court shall not require, request or suggest that the defendant submit to a polygraphic detection deception test, commonly known as a lie detector test, to questioning under the effect of sodium pentothal or to any other test or questioning by means of any mechanical device or chemical substance."

This statute, as amended in 1961, may be found in Ill Rev Stats 1963, chap 38, par 736.2. In the absence of stipulation the courts reject the results of lie detector tests when offered in evidence for the purpose of establishing the guilt or innocence of the accused. People v. Jones, 1962, 52 Cal2d 636, 343 P2d 577; Dugan v. Commonwealth, 1960 (Ky), 333 SW2d 755; People v. Dobler, 1961, 215 NYS2d 313; Henderson v. State, 1951, 94 Okla Cr 45, 230 P2d 495, 23 ALR2d 1292. The reason most commonly assigned for the exclusion from evidence of the results of a lie detector test is that the lie detector has not yet attained sufficient scientific acceptance as a reliable and accurate means of ascertaining truth or deception to be acceptable in a court of law. See Henderson v. State, 1951, 94 Okla Cr 45, 230 P2d 495. Courts have shown reluctance in admitting stipulated lie detector

190

tests even though the expert who gave the test was present in court to answer questions regarding his expertise. State v. Trimble, 1961, 68 NM 406, 362 P2d 788.

In People v. Nimmer, 1962, 25 Ill2d 319, 185 NE2d 249, it appears that at the close of all the evidence the trial judge, in summarizing his reaction to the testimony, remarked that under the evidence he would have no choice but to find the defendant guilty. He went on to suggest that if the defendant would take a lie detector test, that he, the judge, would follow the result of the test. Defendant's counsel expressed his willingness to do so and the trial was continued for this purpose. When the cause came on 10 days later the defendant was adjudged guilty and sentence imposed. Whether a lie detector test had been given or whether the court was following its result does not appear. The Supreme Court, citing Ill Rev Stats 1959, chap 38, par 736.2, said at page 321:

> "Under the clear direction of the statute, the validity or construction of which has not been questioned, we have no choice but to reverse the judgment of conviction and to remand the cause for a new trial."

Following People v. Nimmer, supra, came People v. Zazzetta, 1963, 27 Ill2d 302, 189 NE2d 260. The defendant was charged with burglary and in open court he stipulated to take a lie detector test. It proved unfavorable to his cause and upon trial a report of the test was introduced in evidence over the objection of the defendant. In reversing the court stated that where the defendant, who had an eighth grade education, appeared without counsel in open court prior to his trial for burglary and agreed to take a lie detector test, orally stipulating that the results might be introduced in evidence, the trial court erred by allowing, over objection, the introduction of the results of the test where the operator and interpreter of the test was not present and qualified as an

expert witness. The court also felt that it was unfair to bind the defendant by a stipulation regarding the trustworthiness of scientific opinion far beyond his ken. Reversal was granted on these narrow grounds and apparently limited to these specific facts.

In People v. Boney, 1963, 28 Ill2d 505, 192 NE2d 920, the defendant was picked up for questioning by a member of the State's Attorney's force and given a lie detector test, apparently at his request, or at least with his consent. At the trial the defendant testified, over the People's objection, that the polygraph operator told the officers that the examination indicated defendant's innocence. The court, citing People v. Zazzetta, supra, in commenting on the introduction of the evidence stated, at page 510:

> "Results of the lie-detector test could not properly be introduced as evidence of either guilt or innocence of the accused, and the People's objection thereto should have been sustained."

The Illinois cases show a marked distrust of the value of the use of lie detection for evidence in criminal cases. The defendant urges that prejudicial error was committed because the State's Attorney did not object to the introduction of a lie detector test. The State's Attorney said: "The statute prohibits ordering a lie detector test at this stage of the proceeding." The defendant admits that there was no agreement or stipulation between the prosecution and the defense. Defendant, in effect, is saying that the statute places an affirmative duty on the People to oppose any motion for the taking of a lie detector test. We do not think that the statute requires the People to make timely objections every time a motion for the taking of a lie detector test for evidentiary purposes is tendered to the court. It will be observed that the statute does not require the trial judge to accept for evidentiary purposes the results of a lie detector test

even if there is a stipulation. From the language of the trial judge it is apparent that if the People had stipulated to the lie detector test the judge would not have allowed the results in evidence. The only case of the 13 cited by the defendant where the results of the lie detector test was admitted into evidence is a 1938 New York case, People v. Kenny, 3 NYS2d 348. The Kenny case by sub silentio has apparently been overruled in that state, since in a subsequent case, People v. Forte, 279 NY 204, 18 NE2d 31, the court excluded the results of a polygraph test without noticing the Kenny case. We conclude that the trial judge ruled correctly in refusing the defendant's request to take a lie detector test in order to introduce the results as evidence.

■ Finally the defendant maintains that the court erred in refusing to grant defendant's motion for a three-week continuance. On November 2, 1961, the trial counsel for defendant answered ready. The People then put on the stand their first witness, Florine Lamar. After cross-examination by defense counsel, this witness was excused. At this time the trial judge informed the lawyers that the pending matter would have to be put over for some other date. The State's Attorney informed the court that he would have 6 or 8 more witnesses. The court then inquired of defense counsel if November 7 would be a convenient date for him. He answered that he would be engaged on that day. November 9 was the next date tendered by the court to which defense counsel agreed. It is manifest that the court was seeking to find a day convenient for both parties. November 9 was suitable. If counsel for the defendant needed more time for the preparation of his case this would have been an opportune time to seek it. When the trial was resumed no request was made for a continuance. The record shows that defendant knew the nature of the charge and was conversant with the facts. The record shows that the trial judge gave the defendant every reasonable op-

portunity to introduce testimony to support his position that he was not present at the time of the alleged crime. For these reasons the judgments are affirmed.

Judgments affirmed.

BRYANT and LYONS, JJ., concur.